Colleen O'Brien (Bar No. 215514)
O'Brien & Kelleher, LLP
1655 N. Main St, Suite 220
Walnut Creek, CA 94596-4642
Telephone: (925) 280-1250
Fax:  (775) 249-9120
Email: colleen@eastbayattorneys.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH BUTLER, et al., | Case No.: C07-04369 CRB |
| Plaintiffs, | DECLARATION OF DANIEL C. KELLEHER IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER AND REQUEST FOR SANCTIONS |
| v. | |
| UNITED AIR LINES, INC., | |
| Defendants. | Judge: Hon. Charles R. Breyer<br>Date: February 22, 2008<br>Time: 10:00 a.m.<br>Place; Courtroom 8, 19th Floor |

I, DANIEL C. KELLEHER, declare:

1.  I am a partner in O'Brien & Kelleher LLP, the attorney of record for Plaintiffs.  I have personal knowledge of the matters set forth below.  If called as a witness, I would testify as follows.

2.  This Declaration is being provided to supplement the matters described in the Declaration of Colleen O'Brien and to describe actions taken by Mr. Worthe at and during the breaks in the depositions on January 11, 2008 that may not be readily apparent from the DVD submitted with this motion.

---

1
DECLARATION OF DANIEL C. KELLEHER IN SUPPORT OF MOTION FOR A
PROTECTIVE ORDER AND REQUEST FOR SANCTIONS

3. On January 11, 2008, after attending a hearing in Contra Costa County Superior Court, I drove to Oakland for the Deposition of the United PMK. I attended, in part, because Ms. O'Brien was concerned about the previous aggressive and insulting behavior Todd Worthe had displayed towards her.

4. When I arrived at around 11 a.m., Ms. O'Brien was deposing United's PMK. Several times during the PMK's deposition, Mr. Worthe yelled at Ms. O'Brien. He suggested that she did not know what she was doing and repeatedly threatened to end the deposition for no stated reason. He attempted to unduly rush the deposition and repeated multiple times that the deponent had "flown in from Chicago", had to return, and was in a hurry, although the deponent said it was not a problem at all. In my view, his conduct was unnecessarily aggressive, and his complaints were without merit. He argued constantly with Ms. O'Brien about whether a question had been asked or answered when it clearly had not. From when I arrived, I noted that his conduct was beyond merely rude and insulting; he was behaving in an abusive, threatening manner towards her. Surprisingly, my presence seemed to do nothing to deter him in his aggressions.

5. I sat across from him throughout the afternoon and noted that he was frequently was very agitated, his face turning very red, breathing rapidly, and shouting at Ms. O'Brien on several occasions. You cannot see his face on the DVD, but I sat directly across from him.

6. At lunch, I asked to speak with him, and we got together alone in a separate room. We spoke congenially and generally of settlement terms, but during that conversation he would shift rapidly to ranting, telling me to "make [him] an offer" one second, and insisting Ms. O'Brien was "crazy" the next. He stated that he would not speak to her, and then told me we were both "stupid", "questioned" how could we be "licensed California attorneys", and insisting that we were the "worst lawyers [he] had ever come across in 16 years of practice". He told me in one

breath that "everyone at United" "was furious" with Ms. O'Brien, from the Senior Counsel on down; a minute later he said "no one cares about this case". He kept ranting about how "she wants an apology on the front page of the New York Times", which is not true and lacks a reasonable connection to reality.

7. One of the many striking things about his behavior during that private conversation is that one second he would appear congenial and laughing and fine, and, in an instant, he would get agitated very quickly, becoming physically and visibly upset, and then calm down again and talk about how we could possibly settle. This variance between congeniality and anger struck me as so odd that I thought it might suggest a health issue. I asked him plainly to stop insulting me (he replied "Don't lecture me"). Later, I asked him to calm down and I urged him to eat something, because as a diabetic I am very attuned to the symptoms of low blood sugar. He said he never eats during depositions, and kindly directed me to the donuts in the break room.

8. After the lunch break, we all went back on the record, and he was relatively calm for a while. Ms. O'Brien finished with the PMK during which Mr. Worthe's behavior was markedly improved. But, as the deposition of Ms. Afkari progressed, he again became very agitated, his breathing sped up, he turned very red, and became belligerent again. One time he conferred with his client before she answered a question, and lashed out by yelling at Ms. O'Brien when she objected to the conference. Finally, he became so upset he called off the deposition. He ordered Ms. Afkari out of the room, ranting at Ms. O'Brien and me. Ms. O'Brien tried to preserve the incident for the record; he kept interrupting her. He had removed his microphone, yet his voice was so loud that he could be easily heard across the room. He came back into the room and continued in his agitation, packing, slamming things, and said, among other things: "You have made nothing but an absolute joke of this profession" and "you are a disgrace to this profession".

Ms. O'Brien calmly asked him to call the judge with her to resolve the dispute; he ordered her not to talk to him.  Off the record, she tried to talk to him about Monday's deposition of her and suggested a conference call with the court beforehand.  He shouted at her, "No one cares what you have to say".  She asked him to stop interrupting her so that she could get her questions on the record.  He did for the most part, with brief interruptions.

9. After he left the room, I was actually concerned with for his safety because I had never seen anyone become so aggravated and angry at a deposition or anywhere in my practice—especially someone who was aware that his conduct is being videotaped.  I went out to the hallway as he was leaving, and, I said, in a very calming voice, "Are you okay to drive?"  He shouted, "Don't talk to me" and left.

10.  I have known Ms. O'Brien since we were in the Judge Advocate General's Corps together.  Ms. O'Brien is an excellent attorney who is always well prepared and who conducts herself in a exceedingly professional manner, even under stressful conditions.  She was both enlisted in the Army and an officer in the Coast Guard.  I have seen her in many difficult situations, and she has always acted with the grace called for by the situation.  She is a very thick-skinned person.  Mr. Worthe's conduct toward her on January 11, 2008 was abusive and threatening, and was degrading and insulting even before that.  I know she has tried to handle his harassment in a professional way, and she would not allow him to bait her into a confrontation at the deposition.  That said, I know Mr. Worthe's actions over the past month have taken a toll on her emotionally.  Keeping calm in the face of Mr. Worthe's rising aggression would have been a traumatic event for any reasonable person.  I am sure it will be a continuing and unfair challenge for Ms. O'Brien and Mr. Butler.

11. Based on everything I have witnessed and heard, I believe it would be unsafe and unwise for Ms. O'Brien and Mr, Butler to be deposed absent active court supervision of Mr. Worthe.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: January 14, 2008                              _____/s/_____
                                                    Daniel C. Kelleher, Esq.
                                                    O'Brien & Kelleher LLP
                                                    Attorney for Plaintiffs

---

5

DECLARATION OF DANIEL C. KELLEHER IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER AND REQUEST FOR SANCTIONS