# EXHIBIT 39

Case 3:07-cv-04369-CRB    Document 8-1-4    Filed 02/08/2008    Page 2 of 22

www.chicagotribune.com/travel/chi-
problem_heimert_bd18nov18,0,6940223.column

# chicagotribune.com

## WHAT'S YOUR PROBLEM? NOT GETTING RESULTS? WE CAN HELP

## Problem Solver helps airline passenger get a $5,000 refund

Jon Yates

What's Your Problem?

November 18, 2007

When Mike Heimert booked his one-way flight from Prague to Chicago in June, the numbers seemed a bit foreign.



Although he was using a computer in his Libertyville office to buy his flight from the Czech Republic's capital city, the United Airlines Web site displayed the total in Czech currency, koruna, with a dollar sign: $5,296.88 CZK.

Heimert, a financial adviser traveling for business, had no idea what a koruna was worth. After buying the ticket, he was e-mailed a receipt that showed the base fare to be $1,080.51 U.S., plus $160.88 in taxes and fees. He thought his total was $1,241.39, but the document was not clear.

The receipt still displayed the total as $5,296.88 CZK. With 1 koruna worth roughly 5.5 cents, that came to about $290.

It wasn't until he arrived home from the trip that he saw his American Express

bill and noticed that United hadn't converted the Czech total into U.S. currency. The airline had charged him $5,296.88 U.S.

Heimert and his administrative assistant, Jami Vrba, called United and American Express to protest, but both companies investigated and said there was nothing they could do. United said it would not issue a refund because Heimert had already used the ticket. In another letter, United said the charge in U.S. currency was correct.

American Express said that if United wouldn't change the price, its investigation was closed.

Convinced her boss was getting a raw deal, Vrba wrote What's Your Problem?

She said the proof lay in the receipts, which clearly showed Heimert had been charged in Czech koruna, not U.S. dollars.

"I've sent everybody faxes of his e-ticket, of his receipt, but nobody's looking at it," Vrba said of her letters to American Express and United. "I can never get a person on the phone to look at this piece of paper that says [Czech koruna]."

The Problem Solver had better luck after faxing Heimert's receipt to United spokeswoman Robin Urbanski on Tuesday.

By Thursday, United had agreed to refund Heimert slightly more than $5,000, honoring the conversion rate of $290. United also gave Heimert a free upgrade for use on a future international flight. Urbanski said the actual price of the ticket was $1,241.39, but a glitch in United's computer system resulted in an inaccurate exchange rate.

"It is an isolated case that we are investigating to ensure it does not happen again," she said.

Heimert and Vrba said they were pleased with the decision.

"I'm very happy," Heimert said. "I'm frustrated that we had to go to these lengths to get it."

Vrba said a United representative called her and explained that $290 "wasn't the real price" but that the airline decided to honor it because there was a glitch in the system.

"Anyway you look at it, it wasn't right," Vrba said. "I'm glad they fixed it."

Turn for the better

Everything is now rosy at the Barn Nursery in Crystal Lake, after construction crews showed up Tuesday and began tearing out the median that had obstructed access to the nursery's parking lot.

The nursery's plight was featured in the Oct. 28 What's Your Problem?

As part of a new development across the street that includes a Wal-Mart Supercenter, complete with its own garden center, developers had reconstructed the road outside the nursery, putting in a raised median that made it impossible for cars heading north on Illinois Highway 31 to turn left into Barn Nursery.

Julie Joyce, whose family owns Barn Nursery, wrote the Problem Solver, who then contacted the Illinois Department of Transportation, Crystal Lake officials, Wal-Mart and the developer. The developer, O&S Development, agreed to replace the median with a strip that vehicles can driver over. On Tuesday, crews did just that.

"They're jackhammering away," said Tom Kusmerz, Joyce's father and president of the nursery. "Everybody's overjoyed over here."

By Friday afternoon, the concrete was drying on the new, lower median. Kusmerz said he expects the project to be ready for motorists by Monday.

- - -

THE PROBLEM

Michael Heimert thought he was buying a one-way ticket from Prague to Chicago for $290. United Airlines charged him $5,296.88.

THE SOLUTION

The price was somewhere in the middle, but United refunded Heimert the difference.

-----------

HAVE A PROBLEM? E-mail us your story, providing as many details as possible, to yourproblem@tribune.com or write to What's Your Problem, Newsroom, Chicago Tribune, 435 N. Michigan Ave., Chicago, IL 60611. Please include your name and a way to contact you. We cannot respond to everyone, but we'll get to as many as we can and publish the results on Wednesdays and Sundays.

Copyright © 2008, Chicago Tribune

# EXHIBIT 40

| | | |
|---|---|---|
| 05/30/2006 6/04/2006 Sale | REBILL: UNITED AIR 016406 (Other) | 742668515132870000713 |
| 04/23/2006 6/05/2006 Sale | REBILL:UNITED AIR 016214 (Travel) | 247926261156830002904 |
| 04/23/2006 6/05/2006 Sale | REBILL: UNITED AIR 01621 (Travel) | 247926261156830002904 |
| | | Transaction To |

P000002
7/19/2006

# EXHIBIT 41

1          UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION

3                    ---oOo---

4  NOAH BUTLER and COLLEEN O'BRIEN,

5          Plaintiffs,

6  vs.                                     No. C07-4369(CRB)

7  UNITED AIRLINES, INC., and
   DOES 1 through 100, Inclusive,

8
           Defendants.

9  _____/

10

11

12

13

14        <u>VIDEOTAPED DEPOSITION OF MONICA AFKARI</u>

15

16

17

18        Taken before JEANNIE M. CHIMPKY

19             CSR No. 12742

20           January 11, 2008

21

22

23

24                              One Kaiser Plaza, Suite 505
                                Oakland, California 94612
25                              510/451-1580   Fax 510/451-3797

                                Certified Shorthand Reporters

Aiken
AND
Welch

to happen.  Go to the next question.  This woman
doesn't remember you.  She doesn't remember the night.
Get to her identification as a percipient witness and
that is all.  The rest is to be --

        MS. O'BRIEN:  You submitted this declaration.

        MR. WORTHE:  In support of a motion for
protective order for an unethical communication with
somebody you knew was represented by counsel.  You're
not doing this.  I'll shut it down right now.  We're
not talking about the phone call.

        MS. O'BRIEN:  Do you even want to know --

        MR. WORTHE:  I don't want to know.  It doesn't
matter to me why you want to know.  I'm telling you
what she's not going to say.  Get to your next set of
questions.  You're entitled to talk about the --

        MS. O'BRIEN:  You're instructing her to --

        MR. WORTHE:  Not answer a single question about
who owns the phone, what phone number it is and more
importantly whose name it's under.  You're not getting
that information.  Invades that person's right of
privacy.  She told you she was at her mother's house.
If you want to ask her questions about the content of
the declaration, knock yourself out.
BY MS. O'BRIEN:

    Q.  Is the phone number 510-622-6930?

1      MR. WORTHE:  Objection.  Invades privacy.  What
2  phone number are you asking, the one that you called or
3  the one that she picked up?
4      MS. O'BRIEN:  I'm asking her this message that
5  she got from someone identifying herself as
6  "Colleen O'Brien," is the phone number 510-222-6930
7  (sic)?
8      MR. WORTHE:  Don't answer the question.
9  BY MS. O'BRIEN:
10     Q.  You said in your declaration that you read --
11  this is again in paragraph 11 at the end -- that:  "The
12  name Colleen and the phone contact which comes up on
13  the caller ID is 925-465-0448."  Is that a visual
14  caller ID?
15     A.  Yes.
16     Q.  Is that phone number 818-808-8415?
17     A.  I don't even understand the question you just
18  said.
19     MR. WORTHE:  I don't think you can.
20  BY MS. O'BRIEN:
21     Q.  You said -- When you said "the phone contact
22  which comes up on the caller ID," I assume that you're
23  visually looking at a phone or a caller ID.
24     A.  Um-hmm.
25     MR. WORTHE:  Is that a yes?

EXHIBIT 1
EXHIBIT 2
EXHIBIT 3
EXHIBIT 4

32

1          THE WITNESS:  I'm sorry.  Yes.

2    BY MS. O'BRIEN:

3       Q.  What is the telephone number of the phone that

4    that caller ID "Colleen" came up on?  Is it

5    818-808-8415?

6          You can't confer.  You cannot --

7          MR. WORTHE:  You've been doing it all day.

8    Don't tell me what I can do.

9          MS. O'BRIEN:  You can't confer with the

10   dependent.

11         MR. WORTHE:  Go ahead and answer the question.

12         THE WITNESS:  I'm sorry.

13   BY MS. O'BRIEN:

14      Q.  The question is:  Is the telephone number of

15   the phone of which you saw this 925 number, is the

16   telephone number 818-808-8415?

17      A.  Yes.

18      Q.  Is that a cellphone or landline?

19      A.  Cell.

20      Q.  Is that your cellphone?

21      A.  Yes.

22      Q.  How many times did Colleen call that phone?

23      A.  Once.

24      Q.  When?

25      A.  December 17th.

EXHIBIT 1    EXHIBIT 2    EXHIBIT 3    EXHIBIT 4

Q.  How many times did you call Colleen?

A.  I only called Colleen once to return her call from -- about this whole why she called me at home. I never had anybody call me at my home, harass me about a ticket from my employer.

Q.  And you only called Colleen once and that was in the second or third week of November?

MR. WORTHE:  Objection.  It's been asked and answered.  Get to your point.  One more time, when you called back to return the message --

THE WITNESS:  I returned a call to Colleen.

MR. WORTHE:  We're getting very close to shutting this down.

BY MS. O'BRIEN:

Q.  And that was the second or third week of November?

MR. WORTHE:  If you remember.

THE WITNESS:  About the second, third week of November.  That's when I returned a call to Colleen.

BY MS. O'BRIEN:

Q.  Did you make any other calls to Colleen that day?

A.  No.  I don't know Colleen.

Q.  Do you know Jeff Littlefield?

A.  Yes.

EXHIBIT 1  EXHIBIT 2

Q.   How long have you known him?

A.   Just since I transferred to Oakland.

Q.   So since like May of 2006?

A.   Yes, May 15th.

Q.   Your declaration talks about -- and let me point you to a specific place.  In paragraph -- this is page 2 -- five, six and seven and eight, you talk about "advising Colleen that it's inappropriate to contact an employee at home."  You talk about how you "asked Colleen how she obtained the residential telephone number."  You talk about you questioning Colleen "about where on the website."  You talk about how you advise Colleen she "would not speak to or meet with her as requested."

Was this all during the late November call?

A.   Yes.

Q.   How long did it take for you to advise Colleen of these things during that call?

MR. WORTHE:  If you recall.

THE WITNESS:  I don't know.  I have no idea.

BY MS. O'BRIEN:

Q.   Do you remember how long the call was?

A.   No, I do not.

Q.   Did you take notes on that call?

A.   Notes?

Aiken & Welch Court Reporters    M. Afkari    1-11-08

1    Q.  Um-hmm.  Did you journal anything or write

2    anything down?

3        A.  No.

4        Q.  Did you report that call to anyone at United?

5        A.  I did.

6        Q.  When?

7        A.  That day.

8        Q.  To whom?

9        A.  To my union rep for guidance.

10        MR. WORTHE:  Any discussion between you and

11    your union rep, totally privileged.  Don't even bring

12    it up.  Don't answer the question.

13        THE WITNESS:  Correct.  I've never heard such a

14    thing.

15        MR. WORTHE:  There's no question pending.

16    Neither has anyone else who does this for a living.

17    BY MS. O'BRIEN:

18        Q.  You talk about in your declaration that -- let

19    me find the exact place -- on page 1, line 24:  "During

20    the second week of November 2007 and while this

21    litigation was pending."  How did you know when you

22    wrote this that this litigation was pending?

23        MR. WORTHE:  Objection.  Attorney-client

24    privileged.  Don't answer the question.

25        MS. O'BRIEN:  It's not privileged.  It's in a

1    declaration.

2              MR. WORTHE:  I'm not arguing with you.

3              MS. O'BRIEN:  When was this suit filed?

4              MR. WORTHE:  Don't answer this question.

5              MS. O'BRIEN:  Do you know?

6              MR. WORTHE:  We're done.  Deposition's over.

7    Goodbye.

8              MS. O'BRIEN:  I have more questions.

9              MR. WORTHE:  It's over.  Get a protective

10   order.  Game over.  Let's go home.

11             MS. O'BRIEN:  I have more questions.

12             MR. WORTHE:  You have made nothing but an

13   absolute joke of this profession, absolutely.  You want

14   to compel this deposition, you do it in front of the

15   judge.  Let's get that handled right now.  This is

16   done.

17             MS. O'BRIEN:  Actually, let's get the judge on

18   the phone.

19             MR. WORTHE:  I would love for you to get the

20   judge on the phone.  Do it on Monday with somebody who

21   cares.

22             MS. O'BRIEN:  I'd like to do it now.  I'd like

23   to ask her --

24             MR. WORTHE:  Deposition's over.  Have a nice

25   day.  Monica, go ahead.  Leave the room.

MS. O'BRIEN:  Let the record reflect that
Mr. Worthe has just advised the deponent to leave the
room, that he's packing up his bags; he's walking out
of the deposition and I have several questions that are
pending.

MR. WORTHE:  I'm sure you do because you've
been here since 9:00 o'clock wasting everybody's time.
You're a disgrace to this profession.

MS. O'BRIEN:  I'd like to get the judge on the
phone.

MR. WORTHE:  Great.  Get him on the phone.  He
can call me.  He's got my number.  It's on the
pleadings.

MS. O'BRIEN:  I'm just going to put on the
record here some of the questions that are pending.
These are some of the questions that I didn't get to
ask the deponent.  I had questions for her regarding
whether she had told her employee about whether she had
ever called me.

MR. WORTHE:  "Employee"?  She doesn't --

MS. O'BRIEN:  I said employer.  Don't interrupt
me.  I'm trying to do something.  Did this Colleen ask
you during any of these calls if you were a present
employee of United Airlines?  How many times did you
answer her?  Did Colleen tell you that she could not

1   speak to you if you were a present United Airlines

2   employee?  Did Colleen tell you during that call --

3   Excuse me.  Did Colleen ask you during that call if you

4   were an employee of United Airlines?  What was your

5   response?

6           Am I going too quickly?

7           THE COURT REPORTER:  No.

8           MS. O'BRIEN:  Did Colleen end the November call

9   with you after you didn't respond to her when she asked

10  you if you were an employee of United Airlines?  Did

11  Colleen in fact end the first phone contact with you?

12  Did you in fact not call Colleen four times on the same

13  day in -- that you say is November of 2006?  Did

14  Colleen use the word "lawyer" during the call?  Did she

15  use it during the previous call?

16          Did she mention the names of any people during

17  the call?  Did she mention Noah Butler during the call?

18  Did she mention -- or excuse me; during any call?  Did

19  she mention Jeff Littlefield during any of the calls?

20  Has Colleen contacted you since December 17th?  Did you

21  mention United Airlines' legal department at any time

22  during the call?

23          Did you ever say during any call that you were

24  going to get your own lawyer?  Did you ask Colleen the

25  reasons for her call during these calls?  Would you say

that Colleen was evasive during either call?

Those are some of the questions that I would have asked the deponent. Let me finish. I would have asked the deponent with follow up if Mr. Worthe had not directed her to leave the deposition. So given that he's suspended and he's refused to get the judge on the phone to resolve this dispute, we're going to end the deposition.

Plaintiffs are going to move to compel this deposition and its completion and the answer of the earlier questions.

We're off the record.

MR. WORTHE:  And in light of that, the defendants are going move for a protective order because not one single question that's just been read to the record has anything to do with this dispute. There's a motion for protective order filed with this court and there's going to be another one with as much monetary sanctions as I can muster up for this court. And we'll talk to the judge on a later date.

(Whereupon, the deposition was concluded at 2:55 p.m.)

_____
SIGNATURE OF WITNESS

EXHIBIT 1

EXHIBIT 2

EXHIBIT 3

EXHIBIT 4

1  **WORTHE HANSON & WORTHE**
   **A Law Corporation**
2  1851 East First Street, Ninth Floor
   Santa Ana, California 92705
3  Telephone (714) 285-9600
   Facsimile (714) 285-9700
4  jworthe@whwlawcorp.com
   tworthe@whwlawcorp.com
5
6  JEFFREY A. WORTHE, SBN 080856
   TODD C. WORTHE, SBN 177452
7  Attorneys for Defendant, UNITED AIRLINES, INC.
8
9              UNITED STATES DISTRICT COURT
10     NORTHERN DISTRICT OF CALIFORNIA, WESTERN DIVISION
11 NOAH BUTLER and COLLEEN O'BRIEN,     ) CASE NO.: C07-4369(CRB)
                                        ) ASSIGNED TO:
12              Plaintiffs,             ) HON. CHARLES R. BREYER
13 v.                                   ) DECLARATION OF MONICA
                                        ) AFKARI IN SUPPORT OF
14 UNITED AIR LINES, INC., and DOES 1   ) MOTION FOR PROTECTIVE
   through 100, Inclusive,             ) ORDER
15                                      )
              Defendants.              )
16                                      )
17                                      )
18                                      )
19                                      )
20     I, Monica Afkari, am employed by UNITED AIRLINES, INC. ("UNITED") at
21 Oakland International Airport ("OAK"). I am presently employed as a Customer Service
22 Representative, and have been since June 4, 1990. If called upon to testify, I could and
23 would competently testify to the following:
24     1.    During the second week of November 2007, and while this litigation was
25 pending, your Declarant received a telephone call at my residence from an unknown person
26 by the name of "Colleen" claiming she was a passenger of UNITED, who was having a
27 problem getting her money back from a trip she did not take.
28 ///

                              1

**EXHIBIT**
4
Afkari 1-11-08

WORTHE HANSON & WORTHE
1851 EAST FIRST ST., NINTH FLOOR
SANTA ANA, CALIFORNIA 92705
TELEPHONE (714) 285-9600

Case **3:07-cv-**04369-CRB    Document 28    Filed 12/28/2007    Page 2 of 5

1      2.     The person named "Colleen" indicated that she was "serviced" by your declarant

2  and was given a receipt and/or printout demonstrating charges for a flight that was never

3  taken.

4      3.     Your declarant was unfamiliar with this situation and could not understand why

5  this contact was being done at your declarant's personal residence.

6      4.     The person named "Colleen" indicated that her "attorneys" were in a lawsuit

7  against **UNITED**, and she desired your declarant's assistance. Your declarant informed

8  "Colleen" that this procedure was "highly inappropriate" and advised her to contact the

9  Refund Department of **UNITED** and/or Headquarters to assist with her problem. Your

10  declarant also recommended that "Colleen" visit the company website on the World Wide

11  Web at www.ual.com.

12      5.     Your declarant advised "Colleen" that it was inappropriate to contact an

13  employee at home to assist with a problem against your declarant's employer.

14      6.     Your declarant asked "Colleen" how she obtained the residential telephone

15  number. The person named "Colleen" indicated that she obtained the information "via the

16  web." Your declarant found this response disingenuous and very unlikely.

17      7.     When questioned about where on the web or web-site, "Colleen" located the

18  personal information for your declarant, "Colleen" became evasive and continued to speak of

19  her matter.

20      8.     Your declarant advised "Colleen" that she would not speak to her nor meet with

21  her as she requested. Your declarant further directed "Colleen" to the United Airlines

22  Refund Department and advised her to contact **UNITED**, directly via the "800" number for

23  United Airlines, Inc., or the World Wide Web.

24      9.     Your declarant advised "Colleen" that her "lawyers" should be contacting

25  United Airlines Legal Department. Most importantly, your declarant advised "Colleen" to

26  refrain from any personal contact ever again.

27  ///

28  ///

TELEPHONE: (714) 285-9600

2.

1       10.    On December 17, 2007, at approximately 4:00 p.m. "Colleen" contacted your

2 declarant at my residence again requesting my assistance to provide a "written statement"

3 and a personal meeting. "Colleen" also asked your declarant when she would be available in

4 the Bay area due to your declarant's 818 area code, assuming your declarant resided in Los

5 Angeles. "Colleen" advised your declarant that her "lawyer" wanted to issue a subpoena or

6 take a deposition. At this point, your declarant became very unpleasant and clearly stated

7 that "Colleen" was not to attempt personal contact ever again. Your declarant further

8 advised "Colleen" that this matter would be directed to United Airlines Operational Manager,

9 Jeff Littlefield and the United Airlines Legal Department. Your declarant then hung up the

10 phone.

11       11.    The telephone calls from "Colleen" have been persistent, annoying and

12 incredibly frustrating. The name "Colleen" and the phone contact which comes up on the

13 Caller I.D. is 925-465-0448.

14       I declare under penalty of perjury under the laws of the State of California that the

15 foregoing is true and correct.

16       Executed this 28th day of December, 2007, at Oakland, California.

17

18

19                        MONICA AFKARI, Declarant

20

21

22

23

24

25

26

27

28

                           3