IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOAH BUTLER,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED AIR LINES, INC.,<br><br>    Defendant.<br>_____/ | No. C 07-04369 CRB<br><br>**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND REMANDING REMAINING CLAIMS** |

    Plaintiffs (husband and wife) filed this lawsuit in state court. The complaint makes state law claims for breach of contract, fraud, California Consumer Legal Remedies Act, California Song-Beverly Consumer Warranty Act, emotional distress, and California Business and Professions Code section 17200. It also includes a single federal claim under the Magnuson-Moss Act. Defendant removed the action to this Court on the basis of federal question jurisdiction.

    Now pending before the Court are defendant's motion for summary judgment and plaintiff's cross motion for summary judgment, as well as a motion for a protective order and a motion for sanctions. After carefully considering the parties' papers, and having had the benefit of oral argument, the Court GRANTS defendant's motion in part, and DENIES the motion in part. The Court DENIES plaintiff's motion for sanctions, and REMANDS the remaining state law claims.

## BACKGROUND FACTS

### A. The initial ticket purchase

On April 23, 2006, plaintiff Colleen O'Brien called United to book a July 28, 2006 flight to Rochester, New York via Chicago for O'Brien and her husband. O'Brien was going to be in the second trimester of her pregnancy and have a two hour drive after she arrived in Rochester, so she wanted extra legroom. When she spoke that day to a United representative she emphasized that she wanted to sit in Economy Plus and the agent confirmed that O'Brien was purchasing Economy Plus seats. Colleen O'Brien Declaration In Support of Summary Judgment Motion ("O'Brien Decl. No. 1") at ¶ 6-7.

That same day she received an email confirmation from United and O'Brien's credit card was billed for the tickets. Id., Exh. 1, 2. On April 30, 2006, O'Brien noticed that there were no seat assignments on the confirmation so she called United again. The agent told O'Brien that she had not purchased Economy Plus seats and that she could not purchase such seats. Id.. ¶ 10. As a result, that same day O'Brien sent United a letter cancelling her reservation and requesting a refund. Id., Exh. 3. On May 1, 2006, O'Brien sent a letter to her credit card company, Chase, disputing the United charges. Id., Exh. 4.

On May 10, 2006, Chase contacted United about plaintiffs' dispute. After receiving United's response, Chase decided in plaintiffs' favor. Declaration of Mina Taheri ("Taheri Decl.") Exh. A. On May 26, 2006, Chase debited United's account by the amount of plaintiffs' tickets and on May 31, 2006 debited the account for the $20 service charge. Taheri Decl. ¶ 5. On June 2, 2006, Chase sent plaintiffs a letter stating that they had resolved the dispute in plaintiffs' favor and had credited her account.

At the end of May 2006, O'Brien received a letter from United in response to O'Brien's April 30 letter. The letter advised O'Brien that since her concern was about a future date reservation, she should contact her original booking agent or a United reservations specialist. O'Brien Decl. No. 1, Exh. 5.

//

//

### B.  The subsequent ticket purchase

On June 3, 2006, O'Brien called United "to make sure they had cancelled [her] reservations." O'Brien Decl. No. 1, ¶ 16. The United reservations specialist told O'Brien that her reservations were not cancelled. O'Brien explained that she had cancelled them a month earlier and why. The agent told O'Brien that she could give her Economy Plus seats. O'Brien testifies:

> I agreed, but explained that I had already disputed the ticket on my credit card. I already knew that the dispute had been resolved in my favor and explained that this had happened and that I would need a new reservation. I authorized the agent to charge my credit card and gave her the credit card number. The agent said that the reservation number would not change but that she would bill my credit card anew. She stated that the new charges would appear on my credit card as a "rebill" –in other words, a new charge. I explained that in that case I wanted a new electronic confirmation, showing definitely that I had the Economy Plus seats and showing that I had paid for the new ticket. She agreed to do this. She told me the specific seat assignments she was going to give me, and I wrote those down on a copy of the previous April confirmation. She also told me that the flight numbers and times had changed, and I wrote those changes down on the printout of the April confirmation as well. The printout, with my notes, is attached as Exhibit 8.

O'Brien Decl. No. 1, ¶ 16.

That same day, at 11:25 a.m., O'Brien received an "Email Confirmation from United." It had the same reservation number as the earlier reservation and gave as the "issued" date April 23, 2006–the date of the original ticket purchase. It also included fare and credit card payment information. O'Brien Decl. No. 1, Exh. 9. Fifteen minutes later, O'Brien received a second email which showed her seat assignments and the change in flight times. O'Brien Decl. No. 1, Exh. 10. The seat assignments were the same as the agent told her on the telephone and were for Economy Plus.

O'Brien's credit card statement for the period June 2, 2006 through July 2, 2006 shows a "rebill" from United in the amount of the tickets plus a $20 service charge. The transaction date is listed as April 23, 2006, but the item appears on the card bill between June 3, 2006 and June 4, 2006. O'Brien Decl. No. 1, Exh. 11. United contends that it never received a payment from Chase for this "rebill." Taheri Decl. ¶ 7, 8.

3

1    Because of the problems O'Brien had had with United in the past, O'Brien telephoned
2    United between three and five times in the two weeks leading up to her trip to confirm her
3    tickets. Each time the reservation agent confirmed her reservation. O'Brien Decl. No. 1,
4    ¶ 21.
5    On July 14, 2006, O'Brien logged into her United account to view her "Itineraries."
6    The account confirmed her "ticketed" reservation and showed her seat assignments. O'Brien
7    Decl. No. 1, Exh. 12.

### C. The flight incident

On July 18, 2006, O'Brien attempted to print her boarding passes at home and the website told her that she had to "check in" at the counter. At the airport she tried to check in using the electronic ticket machine, but the machine said she had to see a representative at the counter. She showed the ticket agent her printed itinerary. The agent told O'Brien there was a problem and over the next two hours O'Brien and her husband spoke to four people, none of whom would tell her what the problem was. Eventually the flight left without them. O'Brien Decl. No. 1, Exh. ¶¶ 23-32.

The next day plaintiffs spent all day on the telephone with United attempting to obtain a flight out that night. United told them it would cost $3000 even though plaintiffs faxed United their credit card statement showing the billing and the email confirmation. Eventually a United representative told plaintiffs their reservation had been "cancelled." This was the first time plaintiffs had been told of the cancellation. Plaintiffs were unable to resolve the dispute with United so they purchased Jet Blue tickets for $1498.40 for a flight that night. Id. at ¶¶ 33-40.

That same day O'Brien contacted her credit card company to dispute the June 3 United "rebill." Id. at ¶ 42.

When plaintiffs arrived at the airport for the Jet Blue flight, they stopped by the United counter and spoke to a United representative they had spoken with the night before. The woman printed out a document for plaintiffs and told plaintiffs that the document showed that the United tickets had, in fact, been paid. She gave plaintiffs a number to call to

4

receive a refund and wrote "refund" on the margin on the printout. O'Brien Decl. No. 1, ¶ 45. She also gave plaintiffs a telephone number to call. Id. The United employee also wrote down that plaintiffs had arrived on time for their flight the night before; other United representatives had suggested that plaintiffs had not been allowed on the flight because they had been late. She gave the printout to plaintiffs. O'Brien Decl. No. 1, Exh. 17.

### D. The lawsuit

Plaintiffs wrote United to complain and threatened to sue. In November 2006 United sent plaintiffs a letter stating that their attorneys would be in touch. By February 22, 2007, plaintiffs had not heard from United and thus sent another letter. O'Brien Decl. No. 1, Exh. 24. After still no response, plaintiffs filed this lawsuit in state court in July 2007 and defendant removed to this Court.

All parties have filed cross motions for summary judgment. Plaintiffs have also filed a motion for a protective order and for sanctions.

## JURISDICTION

The only basis for this Court's removal jurisdiction is the Magnuson-Moss Act claim. While the parties are diverse, the amount of controversy is not greater than $75,000.00. Although defendant claims that several of plaintiffs' state law claims are preempted by the Airline Deregulation Act, such preemption is not a basis for removal jurisdiction. Wayne v. DHL Worldwide Express, 294 F.3d 1179, 1184 (9th Cir. 2002).

## DISCUSSION

### I. Defendant's Motion for Summary Judgment

#### A. Contract claim

##### 1. Nonpayment

United moves for summary judgment on the ground that once Chase debited United for plaintiffs' tickets, Chase never sent an additional payment. Indeed, Chase mistakenly debited United's account again. Taheri Decl. ¶ 14. Thus, argues United, plaintiffs never paid any consideration for the subsequent tickets and therefore there can be no breach of contract. The Court is not persuaded. United does not cite any law or provision in the

5

carriage agreement that provides that no binding contract is made until United is actually paid by the credit card company. United has thus not met its summary judgment burden.

### 2. The June 3 Agreement

United also claims that it did not enter into any contract with plaintiffs on June 3, 2006. In sum, it argues that the contract of carriage provides that "United employees do not have the authority to alter, modify or waive any provision of the contract of carriage unless authorized by a corporate officer of UNITED. UA appointed agents and representatives are only authorized to sell tickets for air transportation pursuant to approved fares, rules, and regulations of UA." O'Brien Decl. 1, Exh. 28 at p. 4. As the Ninth Circuit has explained:

> All air carriers engaged in transportation between the United States and foreign nations must file tariffs with the United States Department of Transportation. 49 U.S.C. § 1373(a). Tariffs set forth the rules, regulations, classifications, fares and practices governing air transportation. Valid tariffs are conclusive and exclusive as to the rights and liabilities between airlines and their passengers, even though the passenger may be unaware of the tariff provisions.

Harby v. Saadeh, 816 F.2d 436, 438 (9th Cir. 1987).

United asserts that had it charged plaintiffs a second time, it would have issued completely different ticket numbers and the credit card numbers would reflect a different billing code. Taheri Decl. ¶ 11. United also contends that after it rebills an account after a credit card dispute, the opening number on the same ticket is changed to begin with "916" instead of "016," and plaintiffs' tickets were not changed. While these may be United's internal procedures, United does not identify where in the tariff it provides that rebills must have a particular billing code such that to do otherwise would violate the tariff provisions.

Wittenberg v. Eastern Air Lines, 126 F.Supp. 459 (D.C.S.C. 1954) is unhelpful. There the passenger sued because an airline representative promised to hold a connecting flight at the gate and then did not. The court held that the claim failed because the promise was contradicted by the cited Passenger Rules Tariff. Here, in contrast, United has not cited any particular Tariff provision that would prohibit the United ticket representative–whom United told O'Brien to contact about her problem–from reticketing for the flight. That the representative did not follow United's procedures does not mean that United did not sell O'Brien a ticket.

6

Plaintiffs offer evidence sufficient to support a finding that a contract for transportation was made on June 3, 2006.

First, in response to plaintiffs' April 30, 2006 letter, United sent her a letter telling her to contact a United reservation agent by telephone. O'Brien does so on June 3, 2006. During that conversation she communicates to the agent the whole story. The agent advises O'Brien that she can assign O'Brien Economy Plus seats and rebill the tickets and that she will have the same reservation number. O'Brien provides the agent with her credit card number. That same day O'Brien receives an email from United entitled "E-mail Confirmation." The email has the flight information and fare information, as well as plaintiffs' credit card information. This evidence alone supports an inference that plaintiffs purchased tickets on June 3, 2006.      Second, a few minutes after she received the first email, O'Brien receives a second email with seat assignments and the new flight times. If her tickets had been cancelled, she would not have received seat assignments, the very assignments she made moments earlier on the telephone with the United agent.

Third, O'Brien's credit card statement for June 2006 reflects a "rebill" of the tickets with a transaction date of April 23, 2006. This evidence corroborates O'Brien's testimony about her June 3, 2006 conversation with the United ticket agent.

Fourth, O'Brien repeatedly called United to confirm her reservations and was repeatedly told that she had a valid reservation for the flight; she was never told that her tickets had been cancelled–not even at the airport.

As United has not proved as a matter of law that it is entitled to judgment on plaintiffs' breach of contract claim, United's motion for summary judgment on the breach of contract claim must be denied.

### C. California consumer protection claims

United also argues that plaintiffs' consumer protection statute claims–California Consumers Legal Remedies Act, Song-Beverly Consumer Warranty act, and Business and Professions Code section 17200–are preempted by the Airline Deregulation Act. The Act precludes states from enforcing any "law, regulation or other provision" that has the force

7

and effect of a "law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b). The Supreme Court has held that under this provision, state laws "having a connection with or reference to airline 'rates, routes, or services' are pre-empted." Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992). In American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), the Supreme Court held that the ADA does not preempt run-of-the-mill breach of contract claims because such claims arise from the airline's own agreement without any "enlargement or enhancement based on state laws or policies external to the agreement." Id. at 233. The Court also held, however, that claims under Illinois's consumer protection statute are preempted because they do seek to enforce obligations beyond the airline's own agreement. Id.; see also Power Standards Lab, Inc. v. Federal Exp. Corp.,127 Cal.App.4th 1039, 1044 (2005) ("Helpful to understanding what is and what is not prohibited to state involvement is the distinction between what the parties bargain for and what is externally imposed upon that bargain by a state. Terms, conditions, and remedies offered by the carrier and accepted by the customer qualify as 'privately ordered obligations,' and therefore are not enacted or enforced by the state. 'A remedy confined to a contract's terms simply holds parties to their agreements ... [and] business judgments. . . .'").

Plaintiffs' consumer protection claims here are similarly based on state law obligations outside United's agreement with plaintiffs; if they were not, they would be subsumed by her breach of contract claim. It is thus unsurprising that plaintiffs have not cited a single case in which a consumer protection statute claim against an airline was held not preempted by the Airline Deregulation Act.

Plaintiffs' reliance on Charas v. Trans World Airlines, Inc., 160 F.3d 1259 (9th Cir. 1998) is unpersuasive. In Charas the Ninth Circuit explained how the ADA's preemption of laws relating to an airline's rates, routes and services operates:

> We conclude that when Congress enacted federal economic deregulation of the airlines, it intended to insulate the industry from possible state economic regulation as well. It intended to encourage the forces of competition. It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct. Like "rates" and "routes," Congress used "service" in § 1305(a)(1) in the public utility sense-i.e., the provision of air transportation to and from various markets at various times. In that context, "service" does not refer to the pushing of beverage carts, keeping the aisles clear of stumbling

8

> blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions.

Id. at 1266. This is not a personal injury tort action and thus Charas is inapplicable. Plaintiffs' "unfair competition" claim seeks to regulate competition and thus falls squarely within the purposes of the enactment of the Airline Deregulation Act. Similarly, the CLRA claim seeks to regulate United's marketing practices. The whole purpose of deregulation would be thwarted if states could apply their own consumer protection statutes to regulate the airlines' marketing practices with consumers

### D.   Fraud and misrepresentation claims

United moves for summary judgment on the fraud and misrepresentation claims solely on the ground that plaintiffs cannot establish the existence of a contract. As is explained above, plaintiffs have submitted evidence sufficient to demonstrate the existence of a contract. Accordingly, the motion for summary judgment on these claims fails.

### E.   Magnuson-Moss Act

Finally, United moves for summary judgment on plaintiffs' Magnuson-Moss Act claim on the ground that it is inapplicable to the facts of this case. Plaintiffs do not respond. Summary judgment must granted.

## II.   Plaintiffs' Motion For Summary Judgment

Plaintiffs move for summary judgment on their breach of contract and California Consumer Legal Remedies Act (CLRA) claims. As the Court has determined that defendant is entitled to summary judgment on the only basis for this Court's jurisdiction–the Magnuson-Moss Act–the Court declines to exercise supplemental jurisdiction of the remaining state law claims, including the breach of contract claim. Instead, the Court will remand the remaining claims to state court.

## III.   Plaintiffs' Motion for a Protective Order and Motion for Sanctions

Plaintiffs' motion for a protective order is dismissed as MOOT. The Court DENIES their motion for sanctions.

# **CONCLUSION**

For the reasons stated above, defendant's motion for summary judgment on plaintiffs' breach of contract claim is DENIED.

Defendant's motion for summary judgment on the California consumer protection claims (CLRA, Song-Beverly Act, and Business and Professions Code section 17200) is GRANTED on preemption grounds.

Defendant's motion for summary judgment on the fraud and misrepresentation claims is DENIED.

Defendant's motion for summary judgment on the Magnuson-Moss Act claim is GRANTED.

As there is no longer a federal question in this lawsuit, the Court REMANDS all remaining state laws claims. See United Mine Workers v. Gibbs, 383 U.S. 715 (1966). Plaintiff's motion for summary judgment and motion for a protective order are therefore DISMISSED as moot.

Plaintiff's motion for sanctions is DENIED.

**IT IS SO ORDERED.**

Dated: May 5, 2008



CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE